ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel: (856) 795-2121
By:     John J. McDermott, Esq.
        (jmcdermott@archerlaw.com)
        William J. Stack, Esq.
        Charles J. Dennen, Esq.

LANGSAM STEVENS SILVER & HOLLAENDER, LLP
1818 Market Street, Suite 2610
Philadelphia, PA 19103
Tel: (215) 732-3255
By:     Larry D. Silver, Esq.
        (lsilver@lssh-law.com)
        David E. Romine, Esq.
        Jennifer Graham Meyer, Esq.
        Erin M. Carter, Esq.

*Attorneys for Plaintiff*
*Occidental Chemical Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK DIVISION

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION ) | |
| ) | CIVIL ACTION NO. _____ |
|     Plaintiff, ) | |
| ) | |
| v. ) | Electronically Filed |
| ) | |
| EPEC POLYMERS, INC.; KEWANEE ) | |
| INDUSTRIES, INC.; TRMI-H LLC; WASTE ) | **COMPLAINT** |
| MANAGEMENT, INC.; AND WASTE ) | |
| MANAGEMENT OF NEW JERSEY, INC. ) | |
| ) | |
|     Defendants. ) | |
| _____ ) | |

Plaintiff Occidental Chemical Corporation ("OxyChem") files this action for cost recovery

and contribution under Sections 107 and 113 of the Comprehensive Environmental Response,

Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9607 and 9613 (CERCLA)

for contribution and the recovery from Defendants of response costs that OxyChem has expended to date and will expend in the future in response to releases and threatened releases of hazardous substances into the Lower Passaic River and elsewhere within the Diamond Alkali Superfund Site. The purpose of this action is to ensure that each and every party responsible for the contamination of the Lower 8.3 Miles pays its fair share of the costs of investigation, design, and anticipated implementation of the remedy for such contamination.  Plaintiff intends that any allocation of costs include all Defendants named in this matter as well as Defendants named in the matter pending in the United States District Court for the District of New Jersey, Newark Vicinage, Case No. 2:18-cv-11273, *Occidental Chemical Corporation v. 21st Century Fox America, Inc. et al.*  This action is not intended to impact the pace or progress of the ongoing remediation efforts.[1]

## I.    INTRODUCTION

1.      For more than a century, New Jersey's Passaic River has been a heavily polluted industrial waterway.   In the 1870s, the Passaic River already had "a shocking degree of contamination."   In the next decade, major pollutants in the Passaic River included "sewage, oil, and industrial discharges such as dyes, acids and chemicals."  One study notes that, in 1894, "one-third of the Passaic River's total flow was untreated sewage."   By the turn of the century, the Passaic River was delisted as a commercial fish source; and by 1926, the U.S. government declared the river's "fish life destroyed."

2.      This history is tragic.  But no single hazardous substance, and no single source, is solely to blame.  Over the last century, hundreds of companies—among them, factories, refineries, and manufacturers of all types—polluted the Passaic River with countless hazardous substances. Indeed, the United States Environmental Protection Agency (EPA) sent letters to more than *one*

---

[1] This CERCLA action relates to the Passaic River, which runs through Essex and Hudson counties in New Jersey. The names and addresses of each party are contained, *infra*, in paragraphs 50-55.

*hundred* potentially responsible parties (PRPs) notifying them they may be liable for the costs of cleaning up releases of hazardous substances in the Passaic River.

3.      From the scores of hazardous substances in the Passaic River, EPA identified *eight* chemicals of concern (COCs).  EPA sought a remedy that would achieve its remediation goals for each of these eight COCs.  According to EPA, the eight COCs that drive the requirements for remediation are[2]:

- poly-chlorinated biphenyls (PCBs)
- mercury
- dioxins and furans
- poly-aromatic hydrocarbons (PAHs)
- DDT
- dieldrin
- lead
- copper

4.      In 2016, because of the threat to human health and the environment by each of the eight COCs, EPA issued a Record of Decision that calls for extensive dredging and capping in Operable Unit 2, the first 8.3 miles of the Passaic River (the "OU2 Remedy").  The OU2 Remedy will remove and cap sediment containing hazardous substances.  Removed sediment will be treated, and hazardous substances will be neutralized and disposed of safely.  In turn, the dredged riverbed will be capped, isolating the remaining hazardous substances left in the riverbed sediment.

5.      Despite the century of pollution by hundreds of parties, only *one* company has stepped forward to work with EPA to design the remedy.  Under the Administrative Settlement Agreement and Order on Consent for Remedial Design for Operable Unit Two of the Diamond Alkali Superfund Site (Region 2, CERCLA Docket No. 02-2016-2021) ("2016 ASAOC"), OxyChem agreed to design the OU2 Remedy and foot the design's estimated $165-million bill. Meanwhile, no other company has accepted responsibility for any share of the design cost.

---

[2] Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) ("OU2 ROD") § 5.2 (Contaminants of Concern), https://semspub.epa.gov/work/02/396055.pdf (last visited July 13, 2018).

6.      Just as no single chemical or substance is solely responsible for the contamination in the Lower Passaic River, no single COC is solely responsible for the OU2 Remedy.  Rather, EPA found that each of the eight COCs drives the OU2 Remedy.  EPA determined that anything short of that remedy would leave unacceptable concentrations of each of the eight COCs in the Lower Passaic River.  EPA's selected remedy was based on modeling that each COC—on its own—had sufficiently contaminated the Lower 8.3 Miles of the Passaic to require the OU2 Remedy.

7.      And just as *each* of the eight COCs drives the OU2 Remedy, *each* PRP liable for any one of them must pay its equitable share to clean up that COC.  Each of more than one hundred PRPs disposed of, or is otherwise liable under CERCLA for, at least one of these eight COCs.  In many cases, these parties are liable for several COCs, not to mention other hazardous substances.

8.      The costs of the design of the OU2 Remedy, which OxyChem alone is financing are response costs that address the historic pollution of the Passaic River by scores of PRPs.  As a matter of federal law, those parties must pay their fair and equitable shares of those response costs.  Law and equity demand that they do so for several reasons.

9.      First, OxyChem itself never polluted the Passaic River—as EPA acknowledges.[3] Rather, from the 1940s to 1969, the agricultural chemicals plant located at 80-120 Lister Avenue (the "Lister Avenue Plant") was owned and operated by Diamond Shamrock Chemicals Company (DSCC) or its predecessors in interest.  By no later than June 1983, the public was fully aware of

---

[3] News Release from Region 02, *EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River* (Oct. 5, 2016), https://19january2017snapshot.epa.gov/newsreleases/epa-secures-165-million-agreement-occidental-chemical-conduct-work-needed-start-cleanup_.html (last visited July 13, 2018) ("*Although Occidental Chemical Corporation did not directly discharge pollution into the Passaic River*, the company is legally responsible for pollution discharged from the former Diamond Alkali pesticides manufacturing plant that operated in Newark from the 1940s to the 1960s.") (emphasis added).

contamination at the Lister Avenue Plant, when following an investigation by the New Jersey Department of Environmental Protection (NJDEP), Governor Thomas Kean held a press conference and declared a state of emergency for the Ironbound neighborhood adjacent to the Lister Avenue Plant.

10.     In 1986, more than three years after the Governor's press conference and almost sixteen years after DSCC sold the plant in 1971, an affiliate of OxyChem purchased the stock of DSCC, in a transaction in which DSCC's corporate parent, Maxus Energy Corporation ("Maxus") agreed to "indemnify, defend, and hold harmless" OxyChem against all environmental liabilities. Maxus did just this for the next thirty years: OxyChem held Maxus to its contractual obligation to defend OxyChem for environmental liabilities related to the Lister Avenue Site. But in 2016— through no fault of OxyChem—YPF S.A., Maxus's parent, plunged Maxus into bankruptcy, in an attempt to cleanse its balance sheet of environmental liabilities and escape its indemnity obligations to OxyChem.

11.     Second, the Lister Avenue Plant—the only source of OxyChem's alleged liability—allegedly disposed of only two of the eight COCs identified by EPA as driving the OU2 Remedy: dioxins and DDT. Responsibility for the other six COCs does not lie with OxyChem, but with scores of other PRPs. Further, even as to dioxins and DDT, the Lister Avenue Plant was one among many properties associated with these two COCs. Thus, responsibility for these COCs rests only in part with OxyChem.

12.     CERCLA requires that *all* responsible parties pay their fair shares of response costs they caused or to which they contributed. OxyChem is not responsible for cleaning up all eight of the COCs in the Lower Passaic River or for pollution caused by other parties. Still, OxyChem

stepped up to do its part on the OU2 Remedy, which was driven by and which addresses all eight COCs.  This action is to see to it that all other PRPs follow suit.

13.     Consistent with EPA's goal of requiring all parties to pay their fair shares of response costs, OxyChem brings this action for a money judgment for cost recovery and contribution under CERCLA and for a declaratory judgment as to liability for future response costs so that all responsible parties bear their fair and equitable shares of the costs OxyChem has already incurred and those costs OxyChem will incur in the future to design the OU2 Remedy.

## II.     HISTORY OF THE DISPUTE

### A.     EPA Establishes the Diamond Alkali Superfund Site

14.     The Diamond Alkali Superfund Site (the "Site") was listed on the Superfund National Priorities List in 1984.  As defined by EPA, the Site consists of "the former Diamond Alkali facility at 80-120 Lister Avenue in Newark, New Jersey, the Lower Passaic River Study Area (LPRSA), the Newark Bay Study Area and the areal extent of contamination."[4]  The LPRSA is "the 17-mile, tidal portion of the Passaic River, from RM 0 to Dundee Dam (RM 17.4), and its watershed, including the Saddle River (RM 15.6), Third River (RM 11.3) and Second River (RM 8.1)."[5]  EPA has divided the Site into four "operable units" (OUs):

- OU1, the former site of the Lister Avenue Plant;

- OU2, the lower 8.3 miles of the Passaic River (the "Lower 8.3 Miles");

- OU3, the 17-mile LPRSA; and

- OU4, Newark Bay and portions of the Hackensack River, Arthur Kill, and Kill van Kull.[6]

---

[4] OU2 ROD § 1 (Site Name, Location and Brief Description).

[5] *Id.*

[6] *See id.* § 4.1 (Phased Approach and Early Actions).

15.     Below is a depiction of each of the OUs.[7]



16.     This CERCLA action primarily concerns OU2: the costs of designing and, eventually, implementing the remedy EPA selected for this portion of the Site.  Below is a summary of remedies that EPA has to date selected with respect to each OU.[8]

---

[7] *See id.*, Fig. 1 (Lower Passaic River Study Area).

[8] *See Superfund Site: Alkali Co., Newark, NJ, Operable Units*, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.ous&id=0200613 (last visited July 13, 2018).

| OU ID | Name | Decision Document | Cleanup Technologies Selected in the Decision Document |
|---|---|---|---|
| 00 | SITEWIDE | No decision document | |
| 01 | 80 AND 120 LISTER AVENUE | Record of Decision September 30, 1987 | Cap (engineered cap)<br>Containment (other, NOS, onsite)<br>Decontamination<br>Demolition<br>Disposal (offsite)<br>Monitoring<br>Recycling (offsite)<br>Residuals Treatment/Disposal (onsite)<br>Solidification/Stabilization (exsitu, onsite)<br>Treatment (other, NOS, exsitu, onsite)<br>Vertical Engineered Barrier (slurry wall) |
| 02 | PASSAIC RIVER STUDY - LOWER | Record of Decision March 03, 2016 | Cap (insitu)<br>Dewatering<br>Disposal (offsite)<br>Dredging<br>Habitat Restoration<br>Incineration (offsite)<br>Institutional Controls<br>Monitoring (fish tissue)<br>Monitoring (sediment)<br>Monitoring (surface water)<br>Physical Separation (exsitu, onsite)<br>Residuals Treatment/Disposal (onsite) |
| 03 | NEWARK BAY | No decision document | |
| 04 | EXTENDED PASSAIC RIVER STUDY | No decision document | |

17.     The Site, including the "areal extent of contamination" as designated by EPA, and including the upland sources of that contamination, comprise a "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9) (herein referred to as the "Facility").  There has been a "release" and/or "threatened release" of hazardous substances at the Facility within the meaning of Sections 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(22) and 9607(a).  Organic and inorganic compounds detected at the Facility at elevated levels are "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).  The release and/or threatened release of hazardous substances at the Facility has caused and will continue to cause OxyChem to incur response costs, including costs for removal and/or remedial actions as defined in Section 101(23)-(25) of CERCLA, 42 U.S.C. § 9601(23)-(25).  Such costs are necessary and consistent with the National Contingency Plan.

**B.     OxyChem Acquires Diamond Shamrock Chemicals Company**

18.     As noted, OxyChem did not itself discharge any hazardous substances to the Lower Passaic River.  Instead, OxyChem's liability for cleanup costs allegedly stems from its acquisition of the stock of DSCC in 1986.  DSCC stopped operating the Lister Avenue Plant in 1969, and sold the plant to Chemicaland Corporation in 1971.[9]  In 1977, the Lister Avenue Plant was closed.[10] When OxyChem acquired DSCC's stock in 1986, the Lister Avenue Plant had been closed for nine years, and DSCC had not operated it for seventeen years.

19.     When OxyChem acquired the stock of DSCC, Maxus agreed to indemnify, defend, and hold OxyChem harmless from, among other things, all environmental liabilities resulting from DSCC's closed chemical plant sites, including all liabilities allegedly arising from contamination by the Lister Avenue Plant.

20.     Relying on Maxus's retention of responsibility for the closed DSCC sites, as well as the comprehensive environmental indemnity Maxus provided under the stock purchase agreement, DSCC was merged into OxyChem in 1987.  Maxus's affiliate Tierra Solutions, Inc. ("Tierra") also assumed liability to indemnify, defend, and hold OxyChem harmless against environmental liabilities arising from DSCC's former chemical plant sites and operations.

**C.     EPA Finds That Over One Hundred Parties Are Responsible for Pollution at the Site and Takes Remedial Action**

21.     As part of its Superfund program, EPA has studied the Facility and has taken a series of response actions there.  As EPA recognizes, the Lower Passaic River has been "a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial

---

[9] *See* EPA Record of Decision, Phase I Removal 80-120 Lister Avenue Plant Site (Sept. 30, 1987) § I (Background Chronology Leading to this Record of Decision).

[10] *See id.*

9

facilities" since the 1800s.[11]   Accordingly, "over 100 industrial facilities have been identified as potentially responsible for discharging contaminants into the river."[12]  Following extensive study, EPA concluded that these discharges had contaminated sediments in the Lower Passaic River with hazardous substances, including dioxins, furans, PCBs, PAHs, DDT, dieldrin, other pesticides, mercury, lead, copper, and other metals.[13]  According to EPA, "data shows elevated concentrations of COCs are ubiquitous in sediments of the lower 8.3 miles, bank to bank."[14]

22.     During EPA's decades of conducting investigative and other response actions on the Passaic River, OxyChem has cooperated with EPA and has shouldered more than its share of the burden to clean up the river.  Throughout this period, OxyChem's indemnitors, Maxus and Tierra, have performed work in OxyChem's name and on its behalf.  Together, OxyChem, Maxus, and Tierra have historically borne responsibility for the former operations at the Lister Avenue Plant.

23.     In 1987, EPA issued a Record of Decision that selected as a remedy a cap of the Lister Avenue Plant and the construction of slurry walls to prevent contamination from the Lister Avenue Plant from migrating into the Lower Passaic River.  Construction of that remedy was completed in 2001 by OxyChem's indemnitor, Tierra, pursuant to a Consent Decree (Civil Action No. 89-5025 (AET)) entered by the U.S. District Court for the District of New Jersey in 1990

---

[11]  Administrative Settlement Agreement and Order on Consent for Removal Action, in re: Lower Passaic River Study Area of the Diamond Alkali Superfund Site, Occidental Chemical Corporation and Tierra Solutions, Inc., Respondents (June 23, 2008) (Region 2, CERCLA Docket No. 02-2008-2020) § 10(a).

[12]  OU2 ROD § 2 (Site History and Enforcement Activities).

[13]  *See* Louis Berger Group, Inc., *Remedial Investigation Report for the Focused Feasibility Study of the Lower Eight Miles of the Lower Passaic River* (2014), http://ourpassaic.org/EarlyAction.aspx (last visited July 13, 2018) ("RI Report for the Lower Eight Miles") at ES-2-3.

[14]  OU2 ROD § 5.3 (Sediment Conceptual Site Model).

between the United States and OxyChem and Tierra.  On behalf of OxyChem, Tierra incurred more than $61 million in response costs in complying with the Consent Decree.

24.     After the Lister Avenue Plant was capped, OxyChem, Maxus, and Tierra continued to cooperate with EPA to address contamination at the Site.  In 1994, OxyChem entered into an Administrative Consent Order (Region II, Index No. II-CERCLA-0117) with EPA to perform the Remedial Investigation and Feasibility Study (RI/FS) of a six-mile stretch from RM 1 to RM 7 ("1994 RI/FS ACO for the Lower 6").  Tierra performed that work on OxyChem's behalf.  The RI found dioxins, along with many COCs not linked to the Lister Avenue Plant's operations.  It also demonstrated that Newark Bay's tidal influences caused contaminated sediments to move into and out of this six-mile stretch.  Reinforcing the concern about this tidal influence, the RI Report for the Lower Eight Miles concluded that "mass transport across the RM 0 boundary with Newark Bay is bi-directional" and that "the Upper Passaic River and Newark Bay are the major external sources to the contaminant burden in recently-deposited sediments."[15]

25.     Although COCs not linked to the Lister Avenue Plant's operations were discovered in the Lower Passaic River, no PRP besides OxyChem agreed to bear any of the costs associated with the 1994 RI/FS ACO for the Lower 6.  Instead, those costs were paid entirely by OxyChem's indemnitors, Maxus and Tierra.

26.     In 2002, EPA again expanded the scope of the investigation, to include the full 17 miles of the Lower Passaic River below the Dundee Dam.[16]  As a result of these studies, EPA identified companies other than OxyChem that "owned or operated facilities from which hazardous substances were potentially discharged to the river."[17]

---

[15] RI Report for the Lower Eight Miles at 8-8, Data Evaluation Report No. 2 of App. A. at 4-1.

[16] *See* OU2 ROD § 2.1.2 (The Six-Mile Study).

[17] *Id.* § 2.1.3 (The 17-Mile Study).

27.     A group of PRPs eventually organized into the Cooperating Parties Group (CPG). Initially, OxyChem, Maxus, and Tierra were members of the CPG.  In 2004, the CPG signed a settlement agreement with EPA in which CPG members agreed to pay for the RI/FS for the entire lower 17-miles of the Lower Passaic River ("2004 RI/FS ASAOC for the Lower 17").  That settlement was amended in 2005 and 2007 to add more parties, so that a total of more than 70 parties are now obligated to perform work under this settlement with EPA.  OxyChem, through its indemnitors Maxus and Tierra, paid significant costs associated with this 2004 RI/FS ASAOC for the Lower 17.

28.     On or about June 23, 2008, OxyChem, Tierra, and EPA entered into an Administrative Settlement Agreement and Order on Consent for Removal Action (Region 2, CERCLA Docket No. 02-2008-2020) ("Tierra Removal ASAOC") to excavate and dispose of sediments at RM 3.0 to RM 3.8.  The Tierra Removal ASAOC anticipated that the work would be performed in two phases.  In 2012, Tierra performed the Phase 1 removal and completed dredging, dewatering, and transport of 40,000 cubic yards of sediment, which removed significant volumes of dioxins and of all eight COCs from the Passaic River.  The Phase 1 removal cost over $83 million.  EPA described this removal action as "the most significant removal of contaminated material from the Passaic in history."[18]

29.     On or about October 4, 2011, OxyChem entered into an Administrative Settlement Agreement and Order on Consent for Combined Sewer Overflow/Storm Water Outfall Investigation (Region 2, CERCLA Docket No. 02-2011-2016) ("CSO ASAOC") to determine the nature and extent of contamination emanating from the combined sewer overflows and the storm

---

[18] EPA Press Release, *EPA Signs Agreement with Companies to Remove Major Source of Dioxin from the Lower Passaic River* (June 23, 2008), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/ded62422a0eb385c85257471005eecb0.html (last visited July 13, 2018).

water outfalls to the Passaic River.  Tierra performed work under the CSO ASAOC, incurring response costs more than $2.5 million.

30.     In June 2012, EPA and the CPG signed a consent order for a time-critical removal action to address the high concentrations of dioxins, PCBs, and other contaminants at a mudflat on the Passaic River's eastern bank at RM 10.9 in Lyndhurst, New Jersey.  This removal action is often referred to as the "RM 10.9 Removal."  This removal was more than seven miles upriver from the Lister Avenue Plant—but only slightly downriver from Givaudan Fragrances Corporation's property, whose chemical processes are known to generate dioxins.  Despite this distance from the Lister Avenue Plant, OxyChem voluntarily accepted a Unilateral Administrative Order for Removal Response Activities from EPA (Region 2, CERCLA Docket No. 02-2012-2020), directing it to perform certain activities with respect to the RM 10.9 Removal ("RM 10.9 Removal UAO").  OxyChem is in full compliance with the RM 10.9 UAO.  On OxyChem's behalf, Tierra incurred response costs of more than $1 million under the RM 10.9 Removal UAO.

31.     During the course of these investigations and removal actions, EPA decided to address the Lower 8.3 Miles separately.  Rather than await the outcome of the RI/FS for the lower 17 miles to select a remedy for the entire LPRSA, EPA undertook a targeted Remedial Investigation and Focused Feasibility Study of the lower 8.3 miles of the Passaic River.  This study eventually led EPA to issue the OU2 ROD, which calls for the Lower 8.3 Miles to be dredged and for a protective cap to be installed over the riverbed, to permanently isolate the remaining contaminated sediments. The scientific findings and studies that underlie EPA's selected remedy are set out in two EPA documents: the RI for the Lower Eight Miles and the Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River ("FFS Report").  Both documents are available in the EPA Administrative Record.

32.     On September 30, 2016, OxyChem entered into the 2016 ASAOC, under which OxyChem agreed to design (and fund the costs of designing) the remedy for OU2 of the Lower Passaic River.  Under the order, OxyChem is working with EPA on the design of the engineered cap.   This includes performing a predesign investigation; developing plans for project management, remedial design work, and sitewide monitoring; and executing three distinct remedial designs: preliminary, intermediate, and final.  In the 2016 ASAOC, EPA confirmed that the remedy was selected to address over a dozen hazardous substances, beyond the dioxins and DDT for which OxyChem is alleged to be liable.[19]  EPA also stated that "[d]ata show that, between RM 0 and RM 8.3, surface sediments in the navigation channel are as highly contaminated as those in the shoals, based on median concentrations . . . .  In other words, data show that elevated concentrations of COCs are ubiquitous in surface sediments of the lower 8.3 miles[.]"[20]

33.     EPA originally estimated the design work under the 2016 ASAOC would cost $165 million.  Furthermore, EPA estimates that it will cost an additional $1.38 billion to implement the OU2 Remedy.   Additionally, OxyChem itself has incurred and will continue to incur response costs pursuant to the Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, and the 2016 ASAOC and for investigating and identifying other PRPs.  These costs have been and will continue to be incurred by OxyChem (i) for actions taken in response to the release or threatened release of hazardous substances at the Site, within the meaning of 42 U.S.C. § 9607(a)(4); (ii) for necessary costs of response consistent with the National Contingency Plan,

---

[19] *See* 2016 ASAOC ¶ 11 (Findings of Fact) ("The sediments of the Lower Passaic River contain hazardous substances, including, but not limited to, cadmium, copper, lead, mercury, nickel, zinc, polyaromatic hydrocarbons ('PAHs'), dieldrin, bis (2-ethylhexyl) phthalate, polychlorinated biphenyls ('PCBs'), dichlorodiphenyl-trichloroethane ('DDT'), polychlorinated dibenzo-p-dioxins ('PCDDs') including 2,3,7,8-tetrachloro-dibenzo-p-dioxin ('2,3,7,8-TCDD'), polychlorinated dibenzofurans ('PCDFs'), 2,4-dichlorophenoxy acetic acid ('2,4-D'), 2,4,5-trichlorophenoxy acetic acid ('2,4,5-T'), and 2,4,5-trichlorophenol ('2,4,5-TCP').").

[20]   OU2 ROD § 5.3 (Sediment Conceptual Site Model).

within the meaning of 42 U.S.C. § 9607(a)(4)(B); and (iii) in excess of OxyChem's equitable shares, within the meaning of 42 U.S.C. § 9613(f).

> **D.    Cooperating with EPA, OxyChem and Its Indemnitors Spend Hundreds of Millions of Dollars to Remedy Contamination at the Site**

34.    OxyChem and its indemnitors, Maxus and Tierra, have spent hundreds of millions of dollars in the effort to respond to and remedy contamination in the river, both with respect to the Lister Avenue Plant and for the Site as a whole.  The following costs were borne entirely by OxyChem and/or its indemnitors, on OxyChem's behalf, even though countless others are also responsible to clean up their own pollution of the river:

- OxyChem's indemnitors, Maxus and Tierra, spent over $83 million on a removal action adjacent to OU1, the Lister Avenue Plant, that was contaminated with all eight COCs.

- Tierra incurred over $2.5 million in response costs to investigate the extent of contamination from combined sewer overflows and storm water outfalls into the Passaic River.

- Maxus, Tierra, and certain of their affiliates entered into a $130-million settlement, and OxyChem entered into a $190-million settlement, with the NJDEP for natural resource damages, costs of the state of New Jersey, and economic damages that NJDEP alleged arose from contamination of the river.

- OxyChem agreed to design the OU2 Remedy at an estimated cost of over $165 million.

Once the design of the OU2 Remedy is complete, OxyChem stands ready to discuss with EPA the implementation of the remedy with an acceptable consent decree and with other parties participating—but cannot be expected to do it alone.  Defendants must pay their fair shares of the response costs.

> **E.    OxyChem's Indemnitors Are Forced into Bankruptcy**

35.    In June 2016, YPF, S.A., the parent company of Maxus and Tierra, forced Maxus, Tierra, and certain affiliates into bankruptcy and caused Maxus and Tierra to default on their obligations to indemnify, defend, and hold OxyChem harmless from all environmental liabilities

arising from the Lister Avenue Plant, including alleged liabilities to remediate contamination in OU2 and the Site.[21]  As a result, OxyChem has been forced to incur millions of dollars of response costs to address DSCC's operations at the Site.  OxyChem also expects to incur significant response costs in the future.  OxyChem is prepared to bear its fair and equitable share of the responsibility to remedy contamination at the Facility.  OxyChem is not, however, responsible to identify and remediate Defendants' disposals of hazardous substances.  Instead, Defendants are liable under CERCLA to pay their own equitable shares of these costs.

III.    **EIGHT CONTAMINANTS OF CONCERN DRIVE EPA'S SELECTED REMEDY AT THE SITE, AND EVERY PARTY THAT RELEASED ANY COC MUST PAY ITS FAIR SHARE OF RESPONSE COSTS**

36.    Countless hazardous substances have contaminated the Lower Passaic River.  All of them will be addressed by EPA's selected remedy for OU2.  EPA has, however, identified eight COCs that pose the greatest potential risk to human health and the environment in OU2: dioxins and furans, PCBs, mercury, DDT, copper, dieldrin, PAHs, and lead.[22]  EPA's Preliminary Remediation Goals (PRGs), which are based on both human-health and ecological effects, required a remedy that addresses all eight COCs.

A.    **EPA Determined That the OU2 Remedy Was Necessary to Achieve the Remediation Goals with Respect to the Eight COCs**

37.    EPA determined the OU2 Remedy was necessary to meet the PRGs and that the alternatives to the remedy would not adequately reduce the concentrations of each COC.  For

---

[21] The bankruptcy court ruled that the Liquidating Trust owns OxyChem's claims for common law alter ego, fraudulent transfer, and asset-stripping against Maxus and Tierra's parent companies, YPF, S.A. and Repsol, S.A., which claims the Liquidating Trust is pursuing.  The Liquidating Trust takes the position that this ruling extends to include alter ego claims against YPF, S.A. and Repsol, S.A. under CERCLA to hold them responsible for the actions of their wholly owned subsidiary, Diamond Shamrock (now known as Maxus).  If such CERCLA claims are not pursued by the Liquidating Trust against YPF, S.A. and Repsol, S.A., then OxyChem reserves the right to amend this complaint to assert them itself.

[22] *See* OU2 ROD § 5.2 (Contaminants of Concern).

instance, according to EPA, under a "focused capping" option, PCB concentrations would exceed the goal by a factor of 8, mercury by a factor of 20, dioxins by a factor of 6, and total DDX by a factor of 150 (with these four COCs used as representatives of all eight COCs).[23]  Thus, according to EPA, the OU2 Remedy was necessary to reach the PRGs, and adequately reduce the concentrations of all eight COCs.  "EPA's modeling of each of the alternatives predicted that in order to achieve COC concentrations approaching as closely as possible to remediation goals, bank-to-bank remediation in the lower 8.3 miles is necessary."[24]

38.    EPA has stated that the cleanup plan for OU2 requires the permanent removal from the river of approximately 24,000 pounds of mercury; 6,600 pounds of PCBs; 1,300 pounds of DDT; and 13 pounds of dioxins.[25]  Notably, even before design or implementation of EPA's selected remedy under the 2016 ASAOC, OxyChem's indemnitors already paid to remove a significant volume of dioxins and other COCs in Phase 1 of the Tierra Removal Order.

**B.    Defendants Are Responsible for Their Equitable Shares of the Cost to Remediate All Eight COCs, Along with Other Hazardous Substances**

39.    DSCC's manufacturing process involved only two of the eight chemicals that led EPA to select the remedy: dioxins/furans and DDT.  The Lister Avenue Plant was not the only plant responsible for releases of dioxins/furans or DDT into the Lower Passaic River.  The other PRPs responsible for releases or disposals of dioxins and DDT into the Lower Passaic River must bear their equitable shares of the response costs for those COCs.

---

[23] *See id.* at § 10.3 (Long-Term Effectiveness and Permanence).

[24] *Id.*

[25] *See* Elias Rodriguez, *EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River* (Oct. 5, 2016), https://19january2017snapshot.epa.gov/newsreleases/epa-secures-165-million-agreement-occidental-chemical-conduct-work-needed-start-cleanup_.html (last visited July 13, 2018).

40.     The Lister Avenue Plant did not engage in any industrial processes that generated or caused the disposal of the other six COCs that are also driving the cost of the EPA-mandated remedy: namely, PCBs, mercury, copper, dieldrin, PAHs, and lead.  Accordingly, on *any* theory of liability, OxyChem should not bear any share of the response costs associated with any of these other six COCs that drove EPA to select the OU2 Remedy.  The parties who disposed of the other six COCs should bear the full response costs for those COCs.

41.     Under CERCLA, the Court can and should assess allocable shares of the costs to design the remedy among the responsible parties.  EPA ordered the dredge-and-cap remedy because it found that this was the only remedy that would effectively clean up and isolate all *eight* of the key COCs cited in the OU2 ROD.  EPA indicated that alternatives short of its selected remedy would not achieve the remediation goal for any of the eight COCs.[26]  Accordingly, a fair allocation would first allocate the OU2 response costs in equal shares to each of the eight COCs, with each COC's share then allocated amongst the parties responsible for that COC.

42.     OxyChem has incurred and will incur costs in the performance of the work required by the 2016 ASAOC, including but not limited to, costs of investigation, testing, and design of the remedy mandated by the OU2 ROD.  By this action, OxyChem seeks recovery from Defendants of their respective fair and equitable shares of those costs.  OxyChem also seeks recovery of Defendants' respective fair and equitable shares of the costs OxyChem has incurred and/or will continue to incur pursuant to the Tierra Removal ASAOC, the CSO ASAOC, and the RM 10.9 Removal UAO and costs associated with investigating and identifying other PRPs responsible for polluting the Lower Passaic River, whether as a result of direct discharge, downstream flows, migration from upland sites, improper disposal, or tidal influences from Newark Bay.  In addition,

---

[26] OU2 ROD § 10.3 (Long-Term Effectiveness and Permanence).

OxyChem seeks a declaratory judgment imposing an equitable allocation of all future costs of designing the remedy against at least the parties responsible for the releases of the eight COCs that are driving the remedy.

43.    In connection with the Maxus and Tierra bankruptcy, OxyChem granted a partial release of its CERCLA contribution claim to several PRPs.  None of the Defendants in this action received such a release.

IV.    **JURSDICTION AND VENUE**

44.    OxyChem files this civil action pursuant to Sections 107(a)(1), (a)(2), (a)(3), (a)(4), and (a)(4)(B) and 113(f)(1) and (f)(3)(B) of CERCLA, as amended, 42 U.S.C. §§ 9607(a)(1), (a)(2), (a)(3), (a)(4), and (a)(4)(B) and 9613(f)(1) and (f)(3)(B) for the recovery and contribution from Defendants of response costs that OxyChem has expended to date and will expend in the future in response to releases and/or threatened releases of hazardous substances at the Diamond Alkali Superfund Site.

45.    This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 9607 and 9613(b), providing jurisdiction over controversies arising under CERCLA; 28 U.S.C. § 1331, providing jurisdiction over federal questions; and 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 9613(g)(2), providing jurisdiction over declaratory judgment actions.

46.     Upon information and belief, all parties and/or their predecessors are conducting business in the State of New Jersey and/or conducted business in the State of New Jersey during the relevant time period, and have or had sufficient contacts with the State of New Jersey to be subject to the jurisdiction of this Court.

47.    Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the property where the releases and threatened releases of hazardous substances

have occurred is located within the territorial limits of this District, the damages giving rise to these claims occurred in this District, and at least one Defendant resides in this District.

48.     Pursuant to 42 U.S.C. § 9613(l), OxyChem will provide a copy of the complaint to the Attorney General of the United States and to the Administrator of the United States Environmental Protection Agency.

49.     Pursuant to paragraph 106 of the 2016 ASAOC, OxyChem notified EPA in writing 60 days prior to the initiation of this suit that it intended to file a suit in the United States District Court for the District of New Jersey against liable parties for matters related to the 2016 ASAOC.

V.     **PARTIES**

50.     Plaintiff OxyChem is a New York corporation with its principal place of business at 5005 LBJ Freeway, Dallas, Texas.

51.     Defendant **EPEC Polymers, Inc. (f/k/a Tenneco Chemicals, Inc., Tenneco Polymers, Inc., and their predecessors) ("EPEC")** a subsidiary of Kinder Morgan, Inc., is a corporation organized under the laws of the State of New Jersey with its principal place of business at 40 Avenue A, Bayonne, New Jersey.

52.     Defendant **Kewanee Industries, Inc. ("Kewanee")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California. Kewanee is a wholly owned subsidiary of Chevron Corporation, an active Delaware corporation with a principal place of business at 575 Market Street, San Francisco, California.

53.     Defendant **TRMI-H LLC ("TRMI-H")** is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California.  TRMI-H is a wholly owned subsidiary of Chevron Corporation, an active Delaware corporation with a principal place of business at 575 Market

20

Street, San Francisco, California.

54.     Defendant **Waste Management, Inc. ("Waste Management")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 1001 Fannin Street, Suite 4000, Houston, Texas.

55.     Defendant **Waste Management of New Jersey, Inc. ("WMNJ")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 629-647 South Front Street, Elizabeth, New Jersey.

## VI.   ALLEGATIONS AGAINST INDIVIDUAL PARTIES

56.     OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of the eight COCs—dioxins and furans, PCBs, DDT, PAHs, copper, lead, mercury, and dieldrin (among other hazardous substances)—that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

57.     Defendant **EPEC Polymers, Inc. (f/k/a Tenneco Chemicals, Inc., Tenneco Polymers, Inc., and their predecessors) ("EPEC")** owned and operated at 290 River Drive, Garfield, New Jersey from 1900 to 1982.  The property is part of the Facility.  Chemical manufacturing of pharmaceuticals, cosmetics, food packaging and preservatives, synthetic flavorings, printing inks, and dyestuffs occurred on the property from 1891 until at least 1994. Hazardous substances were used at the property, including formaldehyde, benzoic acid, toluene, benzene, and phenol, among others.  PCBs have been identified in property media.  On information and belief, process waste sewer lines at the property, which were the source of high levels of soil contamination including biphenyl, discharged to the Passaic River.  Additionally, the outfall of the storm sewer network, with catch basins and yard drains existing throughout the property, is the Passaic River.  There were also significant contaminated groundwater releases into the Passaic

River from unconsolidated deposits at the property. Several floods in the basement of Building 33-B, where phenol was stored between 1984 and 1994, may have carried phenol to groundwater. EPEC is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, EPEC is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, copper, and PAHs.

58.     Defendant **Kewanee Industries, Inc. ("Kewanee")** arranged for disposal of hazardous substances at the Bayonne Barrel Property, a former drum processing plant, located at 150-154 Raymond Boulevard, Newark, New Jersey, approximately 1,800 feet west of the Passaic River within the Facility (the "Bayonne Barrel Property"). From 1940 until 1983, Bayonne Barrel & Drum operations on the Bayonne Barrel Property consisted of cleaning and reconditioning steel drums sent to its site by its customers. The drums sent to the Bayonne Barrel Property contained waste, including hazardous substances. Customers of Bayonne Barrel & Drum arranged for and intended Bayonne Barrel & Drum to dispose of their spent and unusable waste present in the drums. Removal of hazardous substances and other wastes from the drums was accomplished using chains and caustic solution or through incineration. Wastewater from removing waste from the drums using solution flowed into a settling sluice and holding tanks and then was discharged to a drainage ditch that flowed into the sanitary sewer or on numerous occasions flowed into

Harrison Creek, a tributary of the Passaic River. Wastewater at the site has been tested to contain, among other hazardous substances, copper, lead, mercury, PAHs, and PCBs. Waste ash (containing hazardous substances) from removing waste through incineration was stored in numerous disposal piles on the property. Sampling of eight ash piles showed the presence of dioxins, PCBs, and metals. Surface runoff from the property, including from the ash piles, flowed through a series of storm drains and into Harrison Creek and the Passaic River. An accidental spill of red dye on the Bayonne Barrel Property in 1984 immediately ran into Harrison Creek, demonstrating the runoff pathway to the Passaic River. Moreover, a study by the New York Academy of Sciences found that, as of 2006, the site runoff was still contributing between 1 and 9 grams of toxic equivalency values of dioxins to the Passaic River each year. Pursuant to an Administrative Order on Consent for Removal Action, numerous parties that had arranged for disposal of hazardous substances at the Bayonne Barrel Property agreed to perform removal activities there. These parties include Kewanee. Disposals of dioxins from the Bayonne Barrel & Drum Property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Kewanee arranged for the disposal or treatment of hazardous substances at the Facility. Under CERCLA § 107(a)(3) and CERCLA § 113, Kewanee is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping dioxins and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, DDT, copper, lead, and PAHs.

59.    Defendant **TRMI-H LLC ("TRMI-H")** owned and operated a bulk petroleum storage facility at 86 Doremus Avenue in Newark (the "Getty Newark Terminal Site"), located at

23

River Mile 1.5 on the waterfront to the Passaic River, which is within the Facility, from 1950 to 1985.  During TRMI-H's ownership and operation of the Getty Newark Terminal Site, hazardous substances emanating from the Getty Newark Terminal Site were disposed of or otherwise came to be located in the Passaic River.  Upon information and belief, during TRMI-H's ownership and operation of the Getty Newark Terminal Site, TRMI-H disposed of effluent from an onsite oil-water separator into the Passaic River and disposed of untreated wastewater to the PVSC where numerous documented storm events and line breaks resulted in discharges to the Passaic River. The Getty Newark Terminal Site is on the waterfront to the Passaic River. PAHs, PCBs, copper, and lead have been detected in soils on the property.  Stormwater flowed through contaminated areas on the Getty Newark Terminal Site and discharged to the Passaic River via runoff during wet weather events.  Disposals of hazardous substances including lead from the Getty Newark Terminal Site have and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§107(a)(2) and/or 107(a)(3), and CERCLA §113, TRMI-H is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, Copper, and PAHs.

60.     Defendant **Waste Management, Inc. ("Waste Management")** is a successor to Peter Roselle & Sons Company ("PRS & Co."), Peter Roselle & Sons Partnership ("the Partnership"), Peter Roselle and Sons Co. and Fereday and Meyer Co., Inc. ("Fereday"), Roselle-Lippman Co. ("Lippman"), and Waste Disposal, Inc. ("Waste Disposal"). Further, Waste Management is a successor to Peter Roselle & Sons Inc. ("PRS Inc.") and the Partnership because

PRS Inc. and the Partnership are alter egos of, or otherwise are indirect corporate successors to the liabilities of, PRS Co. These three entities (PRS Inc., PRS Co., and the Partnership) all participated in the waste disposal industry in Kearny and surrounding areas by conducting hauling and scavenger business, municipal garbage contracts, landfill operations, and operation and leasing of truck fleets. The three entities shared the same office address (163 Tremont Ave.) and the same officers and/or directors (Arthur Roselle, Crescent Roselle, Pietro Roselle, Louis Roselle and Joseph Roselle). Upon information and belief, PRS Inc., PRS Co., and the Partnership failed to observe corporate formalities and operated as one waste disposal operation. Thus, Waste Management is a successor to PRS Inc., PRS Co., the Partnership, Fereday, Lippman, and Waste Disposal (collectively "the Roselle Entities"). Waste Management, as a successor to the Roselle Entities, operated two landfills in Kearny, NJ. The Kearny Landfill (later known as the MSLA 1D Landfill) operated at 1500 Harrison Avenue and the Keegan Landfill (later known as MSLA 1B Landfill) operated at the foot of Bergen Avenue. The Kearny and Keegan Landfills are part of the Facility. Starting in the late 1940s until the early 1980s, the Roselle Entities leased property from the Town of Kearny as individual entities and as a joint venture named the Municipal Sanitary Landfill Authority ("MSLA") to operate the Kearny and Keegan landfills, where they accepted both municipal and industrial waste. During the Roselle Entities' operation of the landfills, hazardous substances were disposed of or otherwise came to be located on the Kearny and Keegan landfills and in the Passaic River. During the Roselle Entities' participation in the hauling business, they arranged for the disposal of hazardous substances at Kearny and Keegan landfills, during which hazardous substances were disposed of or otherwise came to be located at Kearny and Keegan landfills and in the Passaic River.

      a. **The Kearny Landfill**. Upon information and belief, during the Roselle

Entities' operation of the Kearny Landfill, the Roselle Entities disposed of or arranged for the disposal of industrial waste including sludges, pharmaceuticals, activated charcoal and scrubber sludge, filter cake, asphaltic bottoms, insecticides, and pesticides containing hazardous substances into the Passaic River.  Leachate, surface runoff, and drainage discharge from the ditches at the landfill flow into Cedar Creek and Frank's Creek, which are tributaries to the Passaic River.  As of 1995, an estimated 250,000 gallons per day of leachate from the Kearny Landfill, including dioxin-associated compounds (chlorobenzene, 1,4-dichlorobenzene), DDT, PAHs, copper, lead, and mercury, discharged to the Passaic River.  The Roselle Entities are liable as owners and/or operators at the time of disposal of hazardous substances.   Releases of hazardous substances including dioxins from the Kearny Landfill have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.   Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Waste Management is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, DDT, PAHs, copper, lead, mercury, and dieldrin.

b. **The Keegan Landfill.** Upon information and belief, during the Roselle

Entities' operation of the Keegan Landfill, the Roselle Entities disposed of or arranged for the disposal of industrial waste including drummed industrial waste containing hazardous substances into the Passaic River. Leachate, surface runoff, and drainage discharge from the ditches at the landfill flow into Frank's Creek and an unnamed creek, both tributaries to the Passaic River. DDT, dieldrin, 2,3,7,8-TCDD, PAHs, PCBs, copper, lead, and mercury have been detected in soils on the Keegan Landfill. Stormwater flowed through contaminated areas on the Keegan Landfill and discharged to tributaries of the Passaic River via runoff during wet weather, including approximately 65 million gallons of contaminated leachate annually. The Roselle Entities are liable as owners and/or operators at the time of disposal of hazardous substances. Releases of hazardous substances including dioxins from the Keegan Landfill have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Waste Management is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to DDT, dieldrin, PCBs, PAHs, copper, lead, and mercury.

61.     In the alternative to Defendant Waste Management, Defendant **Waste**

27

**Management of New Jersey, Inc. ("WMNJ")** is a successor to the Roselle Entities and thus is liable for their operation of the Kearny and Keegan landfills as well as for the arranging for the disposal of hazardous substances in the Kearny and Keegan landfills.  In 1975, several waste collection companies, including possible Roselle Entities, merged into Waste Disposal, with Waste Disposal as the surviving company.  In 1997, Waste Disposal merged into Waste Management of North Jersey. Inc., which changed its name to Waste Management of New Jersey, Inc.  Under CERCLA §§107(a)(2) and/or 107(a)(3), and CERCLA §113, WMNJ is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to DDT, dieldrin, PCBs, PAHs, copper, lead, and mercury.

## VII.  CAUSES OF ACTION

### COUNT I: CERCLA COST RECOVERY UNDER SECTION 107(a)

62.  Plaintiff realleges and incorporates by reference paragraphs 1 through 61 as if fully set forth herein.

63.  Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance,

28

resulting in a release or threatened release of hazardous substances into the Lower Passaic River, as described in greater detail above.

64.     Each release or threatened release of hazardous substances at the Facility as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. Part 300 et seq. (the "NCP").

65.     Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), Plaintiff is entitled to cost recovery from each Defendant for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the 2016 ASAOC, the Tierra Removal ASAOC, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

(a)     declaring that each Defendant is jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred or to be incurred by Plaintiff as a result of releases or threatened releases of hazardous substances at the Facility;

(b)     awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Plaintiff, including costs incurred in connection with the 2016 ASAOC, the Tierra Removal ASAOC, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs;

(c)      awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and appropriate.

## COUNT II: CERCLA CONTRIBUTION UNDER SECTION 113(f)(1) and 113(f)(3)(B)

66.      Plaintiff realleges and reincorporates by reference paragraphs 1 through 65 as if fully set forth herein.

67.      Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, as described in greater detail above.

68.      Each release or threatened release of hazardous substances at the Facility, as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the NCP.

69.      Pursuant to each of the 2016 ASAOC, the Tierra Removal ASAOC, and the CSO ASAOC, Plaintiff has resolved its liability to the United States for some or all of a response action or for some or all of the costs of such action in an administrative settlement and has incurred and will incur necessary response costs consistent with the NCP.

70.     Plaintiff has incurred and will incur necessary response costs consistent with the NCP in compliance with the RM 10.9 Removal UAO, and is entitled to contribution from defendants pursuant to CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1).

71.     Pursuant to the 2016 ASAOC, the Tierra Removal Order, the CSO ASAOC, and the RM 10.9 Removal UAO, Plaintiff has incurred and will incur in the future more than its fair, equitable share of response costs and damages.

72.     Under CERCLA Sections 113(f)(1) and 113(f)(3)(B), 42 U.S.C. §§ 9613(f)(1) and 9613(f)(3)(B), Plaintiff is entitled to contribution from each Defendant for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the 2016 ASAOC, the Tierra Removal ASAOC, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs.  Plaintiff is also entitled to an allocation by the Court of the response costs, future response costs, and damages as between Plaintiff and the Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

(a)     declaring that the Defendants are liable under 42 U.S.C. §§ 9613(f)(1) and 9613(f)(3)(B) for Defendants' shares, determined by the Court using such equitable factors as it determines are appropriate, of response costs incurred and to be incurred by Plaintiff as a result of releases or threatened releases of hazardous substances at the Facility;

(b)     awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Plaintiff, including costs incurred in connection with the 2016 ASAOC, the Tierra Removal Order, the CSO

ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs; and

(c)     awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and appropriate.

### COUNT III: CERCLA DECLARATORY JUDGMENT

73.     Plaintiff realleges and incorporates by reference paragraphs 1 through 72 as if fully set forth herein.

74.     Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, as described in greater detail above.

75.     Each release or threatened release of hazardous substances at the Facility, as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the NCP.

76.     An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between Plaintiff and Defendants regarding their

respective rights and responsibilities for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the 2016 ASAOC, the Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, for work performed in identifying other PRPs for such response costs, and for future necessary response costs to be incurred by Plaintiff in connection with the contamination at the Facility.

77.     Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201-2202, Plaintiff is entitled to a declaratory judgment on liability for response costs and damages under CERCLA Section 107(a), 42 U.S.C. § 9607(a) and/or CERCLA Section 113(f)(1) and (f)(3)(B), 42 U.S.C. § 9613(f)(1) and (f)(3)(B) that will be binding in any subsequent action or actions to recover further response costs under the 2016 ASAOC, Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for response costs.

78.     If and when EPA selects a remedy or interim remedy for any other portion of the Facility, or assesses damages for injury to, destruction of, or loss of natural resources for any other portion of the Facility, Plaintiff reserves the right to amend to seek additional declaratory or damages relief as to other Operable Units.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

(a)     declaring that the Defendants are liable for all or their proper shares, determined by the Court using such equitable factors as the Court determines are appropriate, of the response costs incurred and to be incurred by Plaintiff resulting from releases or threatened releases of hazardous substances at the Facility;

(b)      declaring that the Court's judgment on each Defendant's liability for response costs and/or damages is binding on any subsequent action or actions to recover further response costs or damages;

(c)      awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Plaintiff, including in connection with the 2016 ASAOC, the Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs; and

(d)      awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and appropriate.

Respectfully submitted,

ARCHER & GREINER, P.C.

Dated: July 13, 2018

By: *s/ John J. McDermott*
      John J. McDermott, Esq.
      (jmcdermott@archerlaw.com)
      William J. Stack, Esq.
      Charles J. Dennen, Esq.
      One Centennial Square
      Haddonfield, NJ 08033
      Tel: (856) 795-2121
      Fax: (856) 795-0574

      LANGSAM STEVENS SILVER &
      HOLLAENDER, LLP
      Larry D. Silver, Esq.*
      (lsilver@lssh-law.com)
      David E. Romine, Esq.*
      Jennifer Graham Meyer, Esq.
      Erin M. Carter, Esq.*
      1818 Market Street, Suite 2610
      Philadelphia, PA 19103
      Tel: (215) 732-3255

Fax: (215) 732-3260

*Attorneys for Plaintiff*
*Occidental Chemical Corporation*

* Pro hac vice application to be filed

## LOCAL RULE 11.2 CERTIFICATION

The undersigned hereby certifies that:

1.      The matter in controversy is related to the subject of an action pending in the United States District Court for the District of New Jersey, Newark Vicinage, Case No. 2:18-cv-11273, *Occidental Chemical Corporation v. 21st Century Fox America, Inc., et al.*  The Plaintiff is the same in both actions and the subject matter and relief requested of different sets of defendants are identical.

2.      The matter in controversy is related to the subject of actions pending in the Superior Court of New Jersey, Appellate Division, Docket Nos. A-2036-17 and A-2038-17, both captioned *N.J. Dept. of Envtl. Prot. v. Occidental Chem. Corp., et al.*, and both arising out of an action in the Superior Court of New Jersey, Civil Division, Docket No. ESX-L-9868-05, captioned *N.J. Dept. of Envtl. Prot. v. Occidental Chem. Corp., et al.* (the "NJDEP Litigation").  While many Defendants in the instant action were third-party defendants in the NJDEP Litigation, the claims against each of those third-party defendants were resolved.  The actions currently pending in the Appellate Division involve the appeals of final orders related to crossclaims among Occidental Chemical Corporation, Repsol, S.A., and Joseph J. Farnan, Jr., as Liquidating Trustee for the Maxus Liquidating Trust, none of whom are Defendants in the instant action.

*3.*      The matter in controversy is related to the subject of an action pending in the United States Bankruptcy Court for the District of Delaware, Case No. 16-11501, captioned *In re Maxus Energy Corp.*, including related adversarial proceedings against Repsol, S.A., YPF, S.A., YPF Holdings, Inc., YPF International S.A., and CLH Holdings, Inc.

>  *s/ John J. McDermott*
>  John J. McDermott, Esquire